UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 26 Cr. |
| ANTHONY HERBERT, | 26 CRIM 0 0 4 |
| Defendant. | |

## Overview

1.      From at least in or about October 2022, through in or about May 2025, ANTHONY HERBERT, the defendant, repeatedly abused his authority as a public official in the Office of the Mayor of New York City ("City Hall") by seeking and accepting bribes and kickbacks in exchange for promising to take, and taking, actions to benefit those who paid him bribes and kickbacks, in two distinct schemes.

2.      In the first scheme, ANTHONY HERBERT, the defendant, solicited and received from a particular individual (the "Security Company Executive") thousands of dollars in cash payments in exchange for HERBERT's advice and pressure of other City government officials to award the Security Company Executive's security guard company (the "Security Company") contracts with the City, including for providing services at New York City Housing Authority ("NYCHA") developments.

3.      In the second scheme, ANTHONY HERBERT, the defendant, advised, pressured, and fraudulently induced other City officials to approve payments to a funeral director (the "Funeral Home Director") of a particular funeral home (the "Funeral Home") under a financial assistance program for burial services for low-income families, in exchange for thousands of

dollars in kickbacks from the proceeds of those reimbursement payments from the Funeral Home Director.

4.      To prevent these schemes from coming to light, ANTHONY HERBERT, the defendant, filed false financial disclosure forms that omitted his receipt of thousands of dollars from both the Security Company Executive and the Funeral Home Director.

5.      In addition, in or about April 2021, ANTHONY HERBERT, the defendant, submitted a fraudulent loan application—including a fake invoice for a purported baked-goods business—to induce a bank to issue HERBERT a $20,418 loan pursuant to the Paycheck Protection Program ("PPP").

### Relevant Individuals

6.      At all times relevant to this Indictment, ANTHONY HERBERT, the defendant, resided in Brooklyn, New York. From in or about February 2022 through in or about September 2025, HERBERT worked for the Office of the New York City Mayor's Community Affairs Unit ("Community Affairs") within City Hall. In that capacity, HERBERT first functioned as the Brooklyn Borough Director for Community Affairs from in or about February 2022 through in or about February 2023, and then as the Citywide Public Housing Liaison until in or about September 2025. In the latter role, HERBERT was responsible for engaging with residents and leadership of NYCHA on behalf of City Hall.

7.      As a City employee, ANTHONY HERBERT, the defendant, was subject to the New York City Charter, which at all relevant times prohibited a "public servant," such as HERBERT, from "accept[ing] any valuable gift . . . from any person or firm which such public servant knows is or intends to become engaged in business dealings with the city," and from "us[ing] or attempt[ing] to use his or her position as a public servant to obtain any financial gain."

2

The City Charter further prohibited public servants, such as HERBERT, from "receiv[ing] compensation except from the city for performing any official duty or accept[ing] or receiv[ing] any gratuity from any person whose interests may be affected by the public servant's official action."

8.    At all relevant times, the Security Company Executive controlled the Security Company, a private security company incorporated in Brooklyn, New York, which was nominally owned by another individual.

9.    At all times relevant to this Indictment, the Funeral Home, located in Brooklyn, New York, was wholly owned by the Funeral Home Director.

### HERBERT Solicited and Received Bribes from the Security Company Executive

10.    As described herein, from at least in or about March 2024 through in or about September 2024, ANTHONY HERBERT, the defendant, solicited bribes of at least $15,000—and accepted bribes of at least $11,000—from the Security Company Executive in exchange for HERBERT's agreement to advise and pressure, and actually advising and pressuring, others within City government to award the Security Company a lucrative City contract, including for providing security to NYCHA properties.

#### *HERBERT Solicited $15,000 in Bribes*

11.    No later than in or about early May 2024, ANTHONY HERBERT, the defendant, began encouraging the Security Company Executive to apply for City security contracts as part of a scheme to solicit bribes from the Security Company Executive in exchange for HERBERT's assistance in obtaining the contracts. For example, on or about May 2, 2024, HERBERT texted the Security Company Executive, "I need your company info and capability outline asap," and four days later, after the Security Company Executive did not respond, HERBERT texted the

3

Security Company Executive again: "Yo[u] must not really be interested in these contracts!" The Security Company Executive promptly responded to HERBERT with the name of the Security Company, and then called HERBERT and the two spoke for approximately two minutes.

12.     Two days later, on or about May 9, 2024, ANTHONY HERBERT, the defendant, communicated to the Security Company Executive how HERBERT's interest in advancing the Security Company Executive's financial interests were tied to the Security Company Executive providing HERBERT with financial assistance. That day, HERBERT asked the Security Company Executive (who was at that time, and all subsequent times relevant to this Indictment, communicating with HERBERT at the direction and under the supervision of law enforcement) via text message for additional information about the Security Company. HERBERT particularly requested from the Security Company Executive a letter on behalf of the Security Company to the City requesting "access to bid[] on contracts." On the same day, and as part of the same text message exchange, HERBERT asked the Security Company Executive for a "loan" of up to $15,000, which HERBERT claimed he would pay back on a monthly basis, though HERBERT never repaid any money received or referenced repayment in future communications. HERBERT followed up with the Security Company Executive several hours later, and again on or about May 11, 2024, asking if the Security Company Executive could provide HERBERT with the "loan" or if HERBERT should "figure something else out."

### HERBERT Ghostwrote a Letter to City Officials on behalf of the Security Company

13.     On or about May 16, 2024, ANTHONY HERBERT, the defendant, emailed the Security Company Executive a ghostwritten letter to City Hall officials so that the Security Company Executive could "peruse [it] for corrections," put it on the letterhead of the Security Company, and send it to City Hall officials. The letter was addressed to two senior City Hall

4

officials ("Senior Official-1" and "Senior Official-2," together the "Senior Officials"), and stated in relevant part, "My name is [name of the Security Company Executive], and I am writing to request an opportunity to present my security company . . . to both of you." The letter introduced the Security Company as a "licensed and certified security company" that offers "a comprehensive range of security services," and further stated that the Security Company was "particularly interested in exploring the possibility of providing security services for NYC Shelters and NYCHA properties."

14.    That afternoon, the Security Company Executive spoke by phone with ANTHONY HERBERT, the defendant. During the phone call, which was observed by law enforcement agents, HERBERT instructed the Security Company Executive, in substance, to finalize the ghostwritten letter and transmit it to City officials because, according to HERBERT, "timing is everything." HERBERT explained, in substance, that City officials were terminating their agreement with the company that was then providing security services to NYCHA, thereby presenting an opportunity for the Security Company to obtain new business by servicing NYCHA properties. Approximately one hour later, the Security Company emailed Senior Official-1, copying HERBERT, attaching a letter on the Security Company's letterhead with text that was nearly identical to the letter HERBERT had circulated earlier that day.

15.    That evening, ANTHONY HERBERT, the defendant, contacted both Senior Official-1 and Senior Official-2. With respect to Senior Official-1, HERBERT sent that individual a text message asking Senior Official-1 to "give me a call from your pvt cell." With respect to Senior Official-2, HERBERT sent a text message advising Senior Official-2 that "I had my guys send you that email regarding their security company." The next morning, HERBERT relayed via text message to Senior Official-2 that the Security Company "wanted guidance as to where to

begin the process" of obtaining City contracts through programs for Minority- or Women-owned Business Enterprises ("MWBEs"), noting that the Security Company's "MWBE status is pending."

16.     Over the next several days, ANTHONY HERBERT, the defendant, frequently communicated with the Security Company Executive. The communications centered on HERBERT's request for money in exchange for HERBERT agreeing to help the Security Company obtain a City contract. For example, on or about May 18, 2024, HERBERT texted the Security Company Executive to ask if there was "[a]ny followup to that request" HERBERT had made for a payment of up to $15,000. The Security Company Executive replied, "Working on it." Four days later, on or about May 22, 2024, HERBERT discussed with the Security Company Executive during a recorded phone call how HERBERT was "planning to follow up with" one of the Senior Officials "in the morning" because the two had "a meeting."[1] The Security Company Executive responded, in relevant part, by referencing the money that HERBERT had requested, stating: "some money came through, so uh I probably meet up with you one day next week if you're free and I'll get that to you." Before their conversation concluded, HERBERT reiterated his desire to obtain money from the Security Company Executive, noting that he was "just trying to stay afloat," and explaining that payment from the Security Company Executive "would be very helpful [and] put me in a better position . . . ."

### HERBERT Accepted a $5,000 Cash Bribe Payment from the Security Company Executive

17.     On or about May 29, 2024, ANTHONY HERBERT, the defendant, and the Security Company Executive agreed to meet later that day outside HERBERT's home in Brooklyn.

---

[1] All recordings described herein were made at the direction and under the supervision of law enforcement.

6

In advance of the meeting, HERBERT texted the Security Company Executive that HERBERT
had "[s]poke[n] to [Senior Official-1] last night as well at the Mayors [sic] townhall, tell u whe[n]
I see u." That afternoon, HERBERT and the Security Company Executive met as planned.

18.    During the meeting, which the Security Company Executive recorded, the Security
Company Executive explained to ANTHONY HERBERT, the defendant, how the Security
Company Executive "always can help you [HERBERT] out with anything you need," in exchange
for HERBERT's assistance. HERBERT proceeded to describe the steps HERBERT was taking to
help the Security Company Executive obtain a contract, recounting his discussions with other City
officials, as follows:

> They said they just gotta get you, you gotta go in the system. And,
> and I, and I, and I whispered, I said, yo, we—this is the kind of guy
> that's gonna be helpful with election time. That's just the bottom
> line. You know, he's gonna be very helpful to me in the projects. I
> can say some shit like that. And whatnot. They were like, aight, this
> is hot.

19.    Later during the meeting, ANTHONY HERBERT, the defendant, explained how
HERBERT was "putting the pressure on" the then-Mayor of New York City (the "Mayor") to
increase security at NYCHA developments, which HERBERT claimed would create more contract
opportunities for the Security Company. HERBERT stated, in relevant part:

> They took, they took, they took the companies out of NYCHA.
> Yeah. Because they had a seven, $7 million deficit. So now the
> mayor, I'm putting the pressure on him through, through NYCHA.
> I'm saying, yo, we gotta put that money back. The seniors are
> fucking complaining. We gotta get some security over there. So he's
> gonna put it back. He's gonna make that announcement and he's
> gonna win. He's gonna win those votes. He's gonna make that
> announcement. And once he does that, there's gotta be a contract in
> place. He's got—that's why I'm trying, that's why I'm rushing you
> to get your shit—. . . I told you send that letter to [Senior Official-1]
> and, and what's his name? They control that shit. And [the Mayor]
> is gonna tell them what to do.

Consistent with this statement by HERBERT, just eight days earlier, on or about May 21, 2024, HERBERT sent a text message to the Mayor—without disclosing his solicitation and receipt of payments from the Security Company Executive—advising that "[a]t that senior center some Resident Leaders were invited who is up in arms about public safety being pulled from NYCHA, just a heads up."

20. Near the conclusion of the May 29, 2024 meeting, the Security Company Executive handed ANTHONY HERBERT, the defendant, $5,000 in cash and told HERBERT, in relevant part, "I see you serious. . . . You working it, then I can, I can make it work. Alright. You know what I'm saying? I could definitely get you more money. I see you seriously working . . . ." The next day, on or about May 30, 2024, HERBERT deposited $4,500 in cash into his bank account.

### *HERBERT Accepted a Second Bribe Payment in the Amount of $2,500 from the Security Company Executive*

21. On or about June 10, 2024, the Security Company Executive complained during a recorded phone call with ANTHONY HERBERT, the defendant, that Senior Official-2 was inadequately assisting the Security Company. In response to that complaint, HERBERT agreed to contact Senior Official-2 to "see what's up." The Security Company Executive then described having recently earned additional money. The Security Company Executive noted how availability of these funds would allow the Security Company Executive to pay HERBERT. HERBERT replied, "Shit dog, that could be helpful . . . You are on point, kid." The Security Company Executive suggested the two meet in person and stated that the Security Company Executive's goal was to "see if we can close this end" and "get this solidified." HERBERT replied, "Don't worry about it, I'll make the connection."

22. ANTHONY HERBERT, the defendant, and the Security Company Executive continued their discussion via text message the next day, on or about June 11, 2024. After

8

HERBERT confirmed for the Security Company Executive that HERBERT would be speaking with Senior Official-2 the next day, the Security Company Executive thanked HERBERT and emphasized how the Security Company Executive was "really banking on this." HERBERT promised he was "working it" but also expressed, via text message, a need for caution to avoid his own role coming to light, warning the Security Company Executive, "I just have to becareful how I do it so it doesnt raise eyebrows."

23. The next morning, on or about June 12, 2024, ANTHONY HERBERT, the defendant, reported to the Security Company Executive that HERBERT had followed through on his promise, texting the Security Company Executive, "You are on the radar." Later that morning, HERBERT and the Security Company Executive spoke by phone. During their discussion, which was recorded, HERBERT recounted the advice HERBERT said he gave to Senior Official-2: "I put the word in. I told him it's important to the mayor that we take care of our MWBEs, if you understand what I'm saying, and go from there."

24. Approximately 15 minutes after this phone call, ANTHONY HERBERT, the defendant, texted the Security Company Executive to request the payment that the Security Company Executive had referenced two days earlier. HERBERT wrote: "I meant to ask if u still can help out." During a recorded conversation later that day, the Security Company Executive confirmed to HERBERT that the Security Company Executive would send HERBERT an electronic payment of $2,500, explaining: "I see the progress happening. And I do know you're making the connections, and I see the connections . . . . And next week I'll be able to throw a little more, you know. As the progress goes, I'm progressing with you, you feel what I'm saying." HERBERT responded, "Got it, got it." The Security Company Executive then electronically transferred $2,500 to HERBERT.

9

25.    During this time period, and consistent with his promises to the Security Company Executive, ANTHONY HERBERT, the defendant, sent text messages to the Mayor advising of a need for the City to retain private security at NYCHA properties. Specifically, on or about June 21, 2024, HERBERT texted the Mayor, again without disclosing his solicitation and receipt of payments from the Security Company Executive: "Fyi...the only major issue in Public housing is the $7 million dollar cut to security, seniors are up in arms, if you can replace security, you will be back at batting 90% with them." HERBERT then texted the Mayor, "HUD [U.S. Department of Housing and Urban Development] flexed . . ." and sent a link to a June 20, 2024 press release titled "HUD Awards $10 Million to Public Housing Agencies to Protect Residents."

### *HERBERT Accepted a Third Bribe Payment in the Amount of $3,500 Cash from the Security Company Executive*

26.    On or about July 3, 2024, the Security Company Executive met at City Hall with Senior Official-2 and one other senior City official with authority over contracting ("Senior Official-3"). Shortly before the meeting, ANTHONY HERBERT, the defendant, and the Security Company Executive met and walked together to City Hall. During these interactions, which the Security Company Executive recorded, HERBERT accepted from the Security Company Executive an envelope containing $3,500 in cash, and HERBERT advised the Security Company Executive how they would conceal HERBERT's role in advancing the Security Company's interests. HERBERT explained that HERBERT himself would not be attending the meeting with Senior Official-2 and Senior Official-3 because, if HERBERT were to attend, "[i]t would look like I'm fucking soliciting, soliciting uh fucking government contracts." HERBERT further coached the Security Company Executive not to imply in the meeting that the Security Company should receive a City contract for any corrupt reasons, stating: "you don't have to say nothing about helping out the mayor or nothing like that. Don't say nothing like that."

10

27.    When ANTHONY HERBERT, the defendant, and the Security Company Executive arrived at City Hall, the two waited together for the Security Company Executive to be called into the meeting. While waiting, the Security Company Executive expressed his gratitude to HERBERT for setting up the meeting. HERBERT replied by recounting how HERBERT had told the Mayor to increase private security services at NYCHA. HERBERT explained: "This is what we do, bro. This is what we do. I mean it's, ain't nobody gonna do it for us. That was one of the reasons why I told him [*i.e.*, the Mayor] he had to put the security back in NYCHA so that more, so like, you could, you could, uh, fuckin submit for that."

28.    At approximately 11:00 a.m., the Security Company Executive was called into the meeting with Senior Official-2 and Senior Official-3. The meeting proceeded—without ANTHONY HERBERT, the defendant, in attendance—for approximately seven minutes.

29.    Shortly after the meeting, the Security Company Executive met again with ANTHONY HERBERT, the defendant, as the Security Company Executive continued to record their interactions. The Security Company Executive remarked that the meeting seemed like a "rush job." The Security Company Executive further stated, "I want this to work out" so that the Security Company Executive could "help out whatever I need to help out with you." In response, HERBERT reiterated, in substance, that he would advise and pressure others to award a contract to the Security Company, informing the Security Company Executive that HERBERT was "going [to] keep pushing it through," and that, in any event, the meeting the Security Company Executive had with Senior Official-2 and Senior Official-3 was "just a formality." HERBERT told the Security Company Executive, "I'm on it," and "don't sweat that, I'll take care of it." The Security Company Executive then told HERBERT, "you gonna make some money. If I make money, then *you*—I got you." HERBERT responded, in relevant part, "Alright."

30.    Later the same day, the Security Company Executive and ANTHONY HERBERT, the defendant, spoke by phone. During their conversations, which was recorded, the Security Company Executive referenced the cash exchange from earlier that day and asked HERBERT to "check out what I gave you." The Security Company Executive explained that the Security Company Executive may have mistakenly "put an extra thousand" in the envelope he had handed to HERBERT. After HERBERT relayed that he had received "35," the Security Company Executive confirmed the payment included an extra "thousand" that the Security Company Executive had intended to use "at the casino." The Security Company Executive told HERBERT not to "worry about it" and to keep the extra thousand dollars. HERBERT responded, "so I can hold onto this? . . .You the man bro.  Thank you." Approximately three hours later, HERBERT deposited $3,000 cash into his bank account.

### *HERBERT Continued to Advise and Pressure Other Officials to Contract with the Security Company*

31.    After the City Hall meeting, throughout July and August 2024, ANTHONY HERBERT, the defendant, continued to advise and pressure other officials for the benefit of the Security Company Executive. During this time, HERBERT frequently contacted the Security Company Executive to request updates on the status of efforts by the Security Company to obtain City contracts, and HERBERT similarly contacted Senior Official-2 and Senior Official-3 to assist the Security Company.

32.    In exchange for this assistance to the Security Company Executive, ANTHONY HERBERT, the defendant, solicited additional payments. For example, on or about August 9, 2024, HERBERT commented to the Security Company Executive during a recorded call that HERBERT was "trying to stay afloat" financially. The Security Company Executive promised to help HERBERT "stay afloat" while imploring HERBERT to "Help me help you!"  HERBERT

responded, in substance, with recognition that the Security Company Executive's financial "help" was exchanged for HERBERT advising and pressuring other City officials to award the Security Company contracts, stating: "what do you think I'm doing, doc? But you know, it's a process, that's the whole thing, it's a process."

33.     Later the same month, in or about August 2024, ANTHONY HERBERT, the defendant, once again ghostwrote a letter for the Security Company Executive to send to City officials—here, Senior Official-2 and Senior Official-3. As HERBERT explained to the Security Company Executive, HERBERT had identified an "opportunity to get [the Security Company] prequalified so that you can get assigned to a few [City] contracts . . . ." Later that morning, HERBERT emailed the Security Company Executive a draft letter addressed to Senior Official-2 that requested "the necessary information and paperwork required to start the process of applying for security contracts as an MWBE." During a recorded phone call later that day, HERBERT explained to the Security Company Executive that the letter should be sent to Senior Official-2 so that, upon the Security Company being prequalified, Senior Official-2 can "start throwing some stuff your way." Further to this plan, on or about August 22, 2024, HERBERT emailed Senior Official-2, among others, and attached the letter HERBERT had drafted, which was now signed by the Security Company Executive's colleague and on the Security Company's letterhead.

34.     Six days later, on or about August 28, 2024, ANTHONY HERBERT, the defendant, learned from the Security Company Executive that the Security Company Executive had not received any follow-up inquiries from City officials in response to the August 22, 2024 letter. During a recorded call, HERBERT stated that HERBERT would follow up with Senior Official-2 and would also report to the Mayor that Senior Official-3 was failing to do "due

diligence." On or about September 4, 2024, law enforcement disrupted HERBERT's scheme. Accordingly, no City contracts were issued to the Security Company as a result of the scheme.

### HERBERT Accepted $5,000 in Kickbacks from the Funeral Home Director

35.    In or about 2022 and 2023, ANTHONY HERBERT, the defendant, exercised his authority as a City employee to advise and pressure other City officials, including through false and fraudulent representations, to approve City reimbursements to the Funeral Home Director, in exchange for kickbacks from the Funeral Home Director. The reimbursements were made pursuant to a burial assistance program administered by the New York City Human Resources Administration ("HRA") for low-income families.

36.    On or about September 12, 2022, at the encouragement of ANTHONY HERBERT, the defendant, the Funeral Home Director emailed HERBERT an invoice of $19,500 for a funeral the Funeral Home Director planned to provide for a particular crime victim ("Victim-1"). The invoice did not reflect any credit for payments received via sources such as the family, GoFundMe (a fundraising website that allows individuals to raise money from others, and is sometimes used to raise funds to cover funeral expenses), or any other sources, such as New York State financial-assistance programs for funeral services for low-income families.

37.    Over the coming months, from September 2022 through December 2022, ANTHONY HERBERT, the defendant, helped facilitate payment of funds for Victim-1's funeral from the City to the Funeral Home Director with the understanding that the Funeral Home Director would pay a kickback to HERBERT with the funds. For example, on or about September 15, 2022, HERBERT emailed a Community Affairs official ("Senior Official-4") and asked Senior Official-4 to "[p]lease process payment request to support funeral expenses for" Victim-1, attaching the invoice from the Funeral Home Director. HERBERT subsequently confirmed that

14

HERBERT was requesting "just $13k" in reimbursement for the Funeral Home Director, and Senior Official-4 responded, "Copy. Will direct HRA to process for 13k."

38.     While ANTHONY HERBERT, the defendant, continued his efforts to obtain City reimbursement for the Funeral Home Director for Victim-1's funeral, another individual ("Victim-2") was killed in mid-October 2022. The day after Victim-2's death, HERBERT provided the Funeral Home Director with contact information for Victim-2's family members. HERBERT purported to carry out this work, at least in part, as part of his City Hall duties and responsibilities.

39.     ANTHONY HERBERT, the defendant, worked to ensure that the Funeral Home Director submitted a funeral reimbursement application for City funding for Victim-2's funeral, reminding the Funeral Home Director to submit an "invoice for the city." Following Victim-2's funeral, in late October 2022, the Funeral Home Director emailed HERBERT an invoice for the funeral, requesting a balance due of $7,845. The same day, HERBERT emailed the invoice to certain Community Affairs officials and noted that "[the Funeral Home Director] is getting alot [sic] of referral business once again with these violent acts"—without disclosing that HERBERT himself was the one referring the Funeral Home Director to victims' families, or the kickback arrangement HERBERT had with the Funeral Home Director—and that "[f]amilies truly respect how he handles the arrangements of their loved ones." HERBERT continued: "I vouch for him . . . ."

40.     On or about October 29, 2022, ANTHONY HERBERT, the defendant, requested via text message that the Funeral Home Director send HERBERT the "names" of the deceased which "we need the city to push thr [sic] checks for asap." Approximately 40 minutes later, the Funeral Home Director sent the names and claim numbers for Victim-1 and Victim-2 (as well as

15

for a third individual, whom HERBERT indicated he would not push the City for because that individual "isn't on my case load so I don't want to raise any eyebrows").

41.     The next month, in or about November 2022, ANTHONY HERBERT, the defendant, continued to correspond with City officials and with the Funeral Home Director to obtain relevant information and facilitate payment from the City to the Funeral Home Director for funerals for Victim-1 and Victim-2. For example, on or about November 22, 2022, HERBERT sent the Funeral Home Director a blank HRA form and told the Funeral Home Director it had to be filled out. On or about November 29, 2022, the Funeral Home Director emailed HERBERT two HRA burial allowance applications for funerals for Victim-1 and Victim-2 that the Funeral Home Director had filled out, which HERBERT forwarded to Community Affairs officials. Senior Official-4 then requested the final invoices, and on or about December 1, 2022, the Funeral Home Director sent HERBERT funeral bills which HERBERT passed on to the Community Affairs officials. The bill for the funeral for Victim-1 now reflected a $3,000 credit from a state funeral assistance program and a final "balance due" of $16,500, and the bill for the funeral for Victim-2 still reflected a balance due of $7,845.

42.     ANTHONY HERBERT, the defendant, particularly played a role in addressing concerns by Community Affairs personnel that the invoices may be over-charging the City. On or about December 12, 2023, Senior Official-4 asked if the family of Victim-1 had received funds from GoFundMe, because "[m]y understanding is that they received $6k in the GoFundMe." HERBERT falsely stated in response, "as per the Funeral home[], I am told there is no knowledge of a gofundme." HERBERT, however, was well aware that Victim-1's family had a GoFundMe page for Victim-1: on or about September 15, 2022, HERBERT acknowledged via text message to a family member of Victim-1 that "[t]here is over $6000 in the gofundme me." After HERBERT

16

falsely told Senior Official-4 that there was no GoFundMe page for Victim-1, senior Community Affairs officials approved the invoices for Victim-1 and Victim-2 to be sent to HRA. The same day, on or about December 12, 2022, HERBERT texted the Funeral Home Director that "[t]hey finally sent in the request for those cases we discussed."

43.    Approximately three weeks later, on or about January 4, 2023, the Funeral Home Director deposited two checks from HRA (both dated December 16, 2022): one check for $16,500 related to Victim-1, and one check for $7,845 related to Victim-2. Two-and-a-half weeks later, on or about January 21, 2023, ANTHONY HERBERT, the defendant, asked the Funeral Home Director if the Funeral Home Director had gotten the "funds from the city" because "they said it went out." The Funeral Home Director responded he had received the funds but that his bank account had been hacked and he was waiting for the bank to replace the funds. With reference to his prior kickback agreement with the Funeral Home Director, HERBERT responded, in part, "Damn Bro[.]  I was counting on that hookup."

44.    Six days later, on or about January 27, 2023, ANTHONY HERBERT, the defendant, deposited a $5,000 check from the Funeral Home Director (also dated January 27). The memo line of the check stated the payment was for "referrals."

<b><u>HERBERT's False Financial Disclosures</u></b>

45.    ANTHONY HERBERT, the defendant, took several steps beyond those described above to conceal his corrupt dealings with the Security Company Executive and the Funeral Home Director. HERBERT especially did so by omitting from his required financial disclosures for 2023 and 2024 that he had received payments from the Security Company Executive and Funeral Home Director.

46.     ANTHONY HERBERT, the defendant, electronically filed his required financial

disclosures for the years 2023 and 2024 on or about May 20, 2024, and May 6, 2025, respectively.

In the disclosures, HERBERT falsely answered "no" to the following questions, among others:

- During [the relevant year], did you receive any gift or gifts valued at $50 or more from the same person or entity or affiliated entities that had business dealings with the City?

- During [the relevant year], did you receive any gift or gifts valued at $1,000 or more from the same person or entity or affiliated entities that did not have business dealings with the City?

- Did you owe any entity or person (other than a relative) $5,000 or more for 90 consecutive days during [the relevant year] or on the date you file this report?

- During [the relevant year], did you . . . receive gifts in the aggregate amount or value of $50.00 from any single source where the source is a person or firm doing business with, or intending to do business with, the City of New York.

47.     In submitting these forms, ANTHONY HERBERT, the defendant, certified that "I

have personally reviewed all information contained in this report and that it is true, accurate, and

complete, to the best of my knowledge." Notwithstanding that certification, HERBERT did not

report the $5,000 he received from the Funeral Home Director in January 2023, nor did he report

the $11,000 he received from the Security Company Executive in May, June, and July 2024.

### **HERBERT Fraudulently Obtained a $20,000 Federal PPP Loan**

48.     The Paycheck Protection Plan was a loan program administered by the United

States Small Business Administration ("SBA") intended to help businesses keep their workforce

employed during the COVID-19 pandemic. Applications for PPP loans were submitted directly to

banks that participated in the program.

49.     On or about April 10, 2021, ANTHONY HERBERT, the defendant, applied for a

PPP loan for a company that reportedly used the business name "Anthony Herbert," and which

had purported gross income in 2020 of $98,010. Based on its reported income, the company was

18

approved for a loan of $20,418. On the application for this loan, HERBERT indicated the purpose of the loan was "Payroll Costs (including proprietor expenses, equal to business expenses plus owner compensation)," and listed himself as the 100% owner and sole employee of the company, which was purportedly established on or about October 1, 2017.

50.    To substantiate that the "Anthony Herbert" business's purported revenue in 2020 was $98,010, ANTHONY HERBERT, the defendant, attached to his PPP loan application an invoice numbered Invoice 2930, dated January 20, 2020, purportedly issued on behalf of the company to a particular customer for $810 (reflecting that it was paid in full in cash) for a "Three layer cake – 80's Themed - Orange, Blue, Black and White – Tie dye color." This invoice, which suggested the "Anthony Herbert" business sold baked goods, was fraudulent. Among other things, the email address listed for HERBERT on the invoice dated January 20, 2020 was created on or about April 9, 2021—over a year *after* the date the purported invoice was issued, and the day before the PPP application was submitted.

51.    The loan application also included a falsified Internal Revenue Service ("IRS") Form 1040 Schedule C (the form used by tax-filers to report income from a sole proprietorship) for the year 2020 for the business "Anthony Herbert." The Schedule C indicated that ANTHONY HERBERT, the defendant, was the proprietor of that business, and that the type of business or profession was "consultant." The Schedule C reported $98,010 in gross receipts or sales, and the same amount as gross profit. The Schedule C also reported specific expenses for the business including $10,325 for supplies and $4,349 for travel, with purported net profit of $78,930. The Schedule C, however, was false: 2020 tax returns prepared for HERBERT by a tax preparer and signed by HERBERT did not include any Schedule C, and the IRS has no record of HERBERT

ever having submitted the Schedule C that HERBERT submitted in support of his PPP loan application.

52.     In submitting the PPP loan application, ANTHONY HERBERT, the defendant, certified (among other things) that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law . . . ." That certification was false.

53.     On or about April 13, 2021, ANTHONY HERBERT, the defendant, received $20,418 as proceeds of the PPP loan via an electronic deposit into his checking account.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Bribery)

The Grand Jury charges:

54.     The allegations contained in paragraphs 1 through 34 and 45 through 47 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

55.     From at least in or about March 2024 through in or about September 2024, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, being an agent of a local government, to wit, the City of New York, which received, in the calendar year 2024, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and a series of transactions of the City of New York involving a thing of value of $5,000 and more, to wit, HERBERT agreed to and did solicit at least $15,000, and accepted at least $11,000, from the

20

Security Company Executive in exchange for HERBERT agreeing to advise and pressure, and in fact advising and pressuring, other City Hall officials to cause the City to award the Security Company security contracts with the City.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT TWO
### (Honest Services Wire Fraud)

The Grand Jury further charges:

56.    The allegations contained in paragraphs 1 through 34 and 45 through 47 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

57.    From at least in or about March 2024 through in or about September 2024, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and to deprive the public and the City of New York of their intangible right to the honest services of HERBERT, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HERBERT solicited and accepted cash payments from the Security Company Executive in exchange for HERBERT agreeing to advise and pressure, and in fact advising and pressuring, other City Hall officials to cause the City to award the Security Company security contracts with the City, and HERBERT transmitted and caused to be transmitted electronic communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

## COUNT THREE
### (Extortion Under Color of Official Right)

The Grand Jury further charges:

58.    The allegations contained in paragraphs 1 through 34 and 45 through 47 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

59.    From at least in or about March 2024 through in or about September 2024, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, knowingly committed and attempted to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, HERBERT, under color of official right, obtained from the Security Company Executive cash payments, with the consent of the Security Company Executive, that were not due HERBERT or his office, in exchange for HERBERT agreeing to advise and pressure, and in fact advising and pressuring, other City Hall officials to cause the City to award the Security Company security contracts with the City.

(Title 18, United States Code, Section 1951.)

## COUNT FOUR
### (Bribery)

The Grand Jury further charges:

60.    The allegations contained in paragraphs 1 through 9 and 35 through 47 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

61.    From at least in or about October 2022 through in or about February 2023, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, being an agent of a local government, to wit, the City of New York, which received, in each of the calendar years 2022 and 2023, benefits in excess of $10,000 under a federal program involving a grant,

22

contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly

solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of

value from a person, intending to be influenced and rewarded in connection with business, a

transaction, and a series of transactions of the City of New York involving a thing of value of

$5,000 and more, to wit, HERBERT solicited and accepted at least $5,000 from the Funeral Home

Director in exchange for HERBERT agreeing to advise and pressure, and in fact advising and

pressuring, other City Hall officials to approve more than approximately $24,000 in

reimbursements for the Funeral Home.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

**COUNT FIVE**
**(Federal Program Fraud)**

The Grand Jury further charges:

62.    The allegations contained in paragraphs 1 through 9 and 35 through 47 above are

hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

63.    From at least in or about October 2022 through in or about February 2023, in the

Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, being an

agent of a local government, to wit, the City of New York, which received, in each of the calendar

years 2022 and 2023, benefits in excess of $10,000 under a federal program involving a grant,

contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, obtained by

fraud property worth at least $5,000 and under the care, custody, and control of the City of New

York, to wit, HERBERT fraudulently induced the City to award funds to the Funeral Home, of

which HERBERT obtained at least $5,000, including by falsely telling City officials there were no

GoFundMe funds raised for Victim-1's funeral, when in fact HERBERT was aware that thousands

23

of dollars had been raised through GoFundMe, and by concealing his referrals of Victim-1 and Victim-2 to the Funeral Home Director.

(Title 18, United States Code, Sections 666(a)(1)(A) and 2.)

## COUNT SIX
### (Wire Fraud)

The Grand Jury further charges:

64.    The allegations contained in paragraphs 5 and 48 through 53 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

65.    In at least in or about April 2021, in the Southern District of New York and elsewhere, ANTHONY HERBERT, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, HERBERT engaged in a scheme to obtain PPP loan funds from the SBA by electronically submitting a false and fraudulent loan application and receiving an electronic transfer of approximately $20,418 in loan funds as a result of such false and fraudulent application, and HERBERT transmitted and caused to be transmitted electronic communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

66.    As a result of committing the offenses alleged in Counts One through Six of this Indictment, ANTHONY HERBERT, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section

2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

67.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third person;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)



FOREPERSON

Jay Clayton

JAY CLAYTON
United States Attorney